Appellant's counsel should begin. Thank you very much, your honor. May it please the court, Mike Sheehy for the government. I'd like to reserve five minutes of my time for rebuttal. This past June and July, DHS officers were confronted with widespread and multiplying protests in the Los Angeles region. As the district court recognized, there is ample evidence that those protests were blighted by violent actors. Yet the court entered a broad preliminary injunction that grants journalists and legal observers a special right to disregard lawful dispersal orders and that places extraordinary restrictions on officers' ability to disperse violent or disruptive crowds with crowd control devices. So we urge this court to say the injunction pending appeal. The government's likely to prevail on appeal because plaintiffs are not entitled to any injunctive relief, both because they lack standing and because their First Amendment claims are meritless. But even if plaintiffs were entitled to some form of injunctive relief, this injunction should at a minimum be stayed because it sweeps far beyond anything necessary to remedy their alleged injuries, and because it imposes all manner of unworkable restrictions on federal law enforcement officers. Counsel, let me ask you this. Setting aside the question of standing, to the extent that the injunction is commensurate with DHS or CDB's own policies, do you have an objection to that? We do, Your Honor. Setting aside the issue, of course, that many of the provisions in the preliminary injunction go beyond what DHS policies require. For example, the first provision of the injunction— Let me slow you down there, because I recognize that you're arguing over breath. So I think on some provisions, your arguments are better than the others. So what I'm trying to do is I'm trying to figure out what the government's position is with regard to provisions that are consistent with your own policies. So, Your Honor, we believe that even those provisions that are modeled on DHS policies ought to be stayed pending appeal for two reasons. The first is because those provisions resemble something like a follow-the-law type injunction, which is disfavored. And the second reason is because what the injunction does is it converts those policies, which ordinarily would be enforced by DHS against its officers on the basis of violations that come to DHS's attention, into components of a judicially enforceable injunction that would be subject to contempt proceedings in an Article III court. And that makes the district court into exactly the sort of roving commission exercising supervision over the executive branch that the Supreme Court has cautioned courts against adopting in cases such as the transunion against Ramirez case. And so even those provisions, Your Honor, that are modeled on DHS policies, we would still believe are unworkable because officers will now have to guess whether the district court in the cold light of day after nonlethal devices have been used will agree. I think that's where the safe harbor provision really comes in. But if we accept the district court's factual findings, for example, that DHS threatened and insulted journalists, then those disfavored provisions follow your own policies would be warranted, I would think. So, Your Honor, the safe harbor provisions aren't a safe harbor at all for a number of reasons. And I think the most persuasive is that they're framed in highly legalistic terms. And moreover, the officers will need to guess as to what the district court thinks will amount to compliance with the injunction. If I could give Your Honor an example, one of the provisions that was modeled after DHS policies is the provision requiring two warnings before the use of crowd control devices. At the outset, that's a very wooden prescription, Your Honor, in some circumstances, as DHS policies recognize, giving those warnings may not be feasible and that's left to the judgment of the officers. Moreover, that provision has a subjective component too, because it requires officers to make sure that everybody in a very loud, disruptive or even violent crowd can be sure that they've heard the warnings. Because after all, the provision requires officers to give two warnings audible to the crowd as the crowd proceeds. And so officers on the fly are going to have to determine whether their warnings were enough to be heard, whether the crowd will think that the warnings are loud enough to be heard, and make all of those choices on the fly in a very difficult, intense, potentially violent situation. Counselor, let me turn to a different point for a minute. And I'm going to ask this question to your friends on the other side as well. I understand your arguments on standing. The way I read the injunction, in addition to providing relief for what the District Court describes as journalists and legal observers, unless I'm misreading the injunction, it also seems to provide very significant relief for what the does the government, what's the government's position putting aside? I understand your standing arguments and the First Amendment arguments. But if we weren't, for example, to accept those in whole, does the government have a separate argument about why any relief directed to quote, unquote, protesters, which is the term the District Court used, would be inappropriate? Yes, Your Honor. So, one, we agree that many of the provisions of the injunction cover this undefined term protester, which, you know, the court has never really been quite clear about who falls within that definition. But it could conceivably include everybody in the entire Central District of California, which is almost 20 million people, so long as they show up to a protest. And so, the case that makes clear why that would be inappropriate is the Supreme Court's recent decision in Trump against CASA, which establishes, once again, that injunctive relief, granting complete relief to plaintiffs is a ceiling, not a floor, and that courts must account for countervailing equitable considerations. Now, provisions governing protesters transgress the court's description of equitable relief in two ways. Number one, basically, none of those 20 million people are plaintiffs in this lawsuit. The court in CASA, as part of the quote that you were talking about, specifically talked about injunctions are appropriate only to the extent that are inappropriate if they're broader than to provide complete relief to each plaintiff withstanding to sue. With regard to the complaint that was in existence at the time the district court entered its preliminary injunction, correct me if I'm wrong, but the only plaintiff that I see here that would potentially qualify as a plaintiff is Ms. Olmeda. Is that right? I believe there is only one plaintiff who is a protester, but the other side can correct me if there are more than one, but there certainly will not be more than a handful of named plaintiffs who would qualify as protesters, as that term might ordinarily be understood, and yet the injunction grants relief to anybody who shows up to a protest. Let's say that we agree with you that the injunction is overbroad as to any potential protesters who may show up. Given that the named plaintiffs are likely to show up at future protests, assuming that we think some form of injunctive relief is appropriate, how do you think we can further narrow, or how the district court can further narrow or tailor injunctive relief to give complete relief to the named plaintiffs? So, Your Honour, if I could offer a theoretical answer to that question and then a practical answer to that question. As a matter of law, I would dispute Your Honour's premise that if plaintiffs are likely to prevail on the merits, then they are automatically entitled to complete relief. In my colloquy with Judge Bennett, and the quote that we've been reading from Trump against Casa, that makes clear that complete relief is a ceiling, not a floor, and plaintiffs aren't automatically entitled to complete relief just because they satisfy the four preliminary injunction factors. So I just want to take that and set it to one side before answering your question practically. We think if the court thinks that this injunction is overbroad, but that some other injunction might not be, we urge the court to say this injunction and ultimately to vacate it with instructions to the district court to consider the party's submissions to the extent that the plaintiffs think that they can come up with a narrower injunction and then have those issues be discussed in the papers by the district court in the first instance. I would be hesitant to hypothesize about the workability and the potential breadth of any hypothetical injunction that's different from the terms of this one because any injunctive relief needs to be addressed against the backdrop of the equitable factors specific to the terms of that injunction. And so that's the reason I would urge this court, if it believes this injunction is overbroad, simply to stay and vacate it and then return it to district court and let the district court decide in the first instance if some other injunctive relief would be appropriate. I wanted to ask a question of Mr. Sheehy. Does the government concede that the use of non-lethal force can be excessive? I want to make sure I understand your question, Your Honor. Are you asking whether the use of crowd control non-lethal devices can be excessive under the rubric of the Fourth Amendment? Yes. Yes, Your Honor. My understanding is that the use of force would naturally be governed by Fourth Amendment principles and principles like that. And that's the most natural rubric to assess claims that law enforcement officers deployed too much force in response to a particular threat that law enforcement was trying to disperse. I would note, though, that this case doesn't involve Fourth Amendment claims. Although plaintiff did raise Fourth Amendment claims, the injunction wasn't premised on the Fourth Amendment, and the district court made no finding that the force used was excessive under the Fourth Amendment. And nevertheless, plaintiffs have continued to characterize the force used as excessive under the Fourth Amendment in a manner that presupposes the answer to that question. I think Your Honor's question, though, puts its finger on another fundamental point about the merits of plaintiffs' First Amendment, which is that the First Amendment is, at bottom, kind of an awkward rubric to assess these claims that the force used was disproportionate. The upshot of the view is that any sort of claim for excessive force that occurs at a protest would automatically be converted into a First Amendment claim, and that just puts too much pressure on the First Amendment doctrines that the other side has invoked. The retaliation claims in particular, I think, illustrate this point most powerfully. As this Court discussed in the Puente against City of Phoenix case, which was decided quite recently, the First Amendment retaliation doctrines are just an unnatural fit for the use of crowd-control devices in a crowd dispersal context. Precisely because that doctrine turns on the subjective intent of individual officers, and yet the district court was quite comfortable generalizing, in sweeping terms, about every single use of force that was described in plaintiffs' declarations as somehow being retaliatory in intent subjectively on the part of the officers. And that's the sort of broad brush analysis that goes far beyond what the First Amendment doctrines permit and would be much more naturally addressed with the context of the Fourth Amendment. Thank you. Mr. Shi, I have one more question for you, and then I'll probably just listen to what my colleagues are about and what you say to them. But this question is whether you feel you have, in your briefing and your argument, given us all the changes you think would be needed in order to affirm an injunction? Your Honor, I'm not sure I understand the question. I had the impression from your arguments in the brief that you didn't feel any injunction. Could be valid. And putting aside standing, if there is standing, is there any way that the overbreath could be cured in your view? I see. So if I understand your Honor's question, and I also note that I think my time has expired because if that's permissible, I can answer your Honor's question. You can give a full answer, and then I want to let Judge Wind finish her line of questioning. Of course, Your Honor. So assuming that the court agrees that plaintiffs have standing, and assuming the court agrees that plaintiffs are likely to prevail on the merits of their First Amendment claim, it's conceivable that there might be some form of injunctive relief that a court could enter, but I don't want to commit to anything in particular because, as I noted earlier in the argument, whether any particular type or restriction on the government in an injunction is an acceptable use of the equity power will determine, is determined in significant part on what that says and how it interacts with the facts on the ground. So I'm not going to give a high-level answer saying yes, there is an injunction that exists, or no, there is an injunction, no possible injunction exists. All I can say, Your Honor, is that this injunction is overbroad, and so the injunction should be stayed and then vacated, and then it should be up to the district court in the first instance if plaintiffs still believe they would like to seek an alternate form of injunctive relief, you know, presented in the papers. Thank you. I appreciate your full answer. And by the way, for all the advocates today, we have time to permit complete answers to questions, so, you know, please feel free to proceed. And we're also going to make sure you have time to answer any questions from the judges. Thank you, Judge Gold. I appreciate that. Actually, my question is along the same lines. You seem to suggest that the only option for the court, if we think that some portion of the I'm not sure I understand that. So, for example, and this is related to what I started talking to you about, to the extent that we think some portions of the preliminary injunction is warranted, that is supported by the factual findings of the district court, no more than is consistent with the department's own policies that the district court apparently believe is not being followed. I don't know why vacating the entire injunction is the relief that the government's rather than doing it in part. So, Your Honor, I understand your question. And if I could offer one caveat to that, we disagree that even those portions of the injunction is discussed that mirror or based on DHS policies would be workable and sufficiently within the power of But if the court disagrees, Your Honor, it is certainly within the discretion of the court to stay and then vacate only those portions of the injunction that the court believes are overbroad. And I certainly didn't mean to suggest otherwise. Our point is, however, at the threshold level, even those provisions that Your Honor has identified would not be consistent with the way the Supreme Court has described. Right. No, I understand. And I have one additional question. I know I've used up a good chunk of your time. We're now just a few weeks from hearing on the preliminary injunction. Is there some irreparable harm to the government in denying the same motion that you haven't already discussed in your papers filed with the court? So my understanding, Your Honor, is that the situation on the ground remains fluid. The most recent information in the record is attached to the government's district court state filings from September. That information in those declarations make clear that although the character of the protests on the ground may have changed, there continue to be protests in the Los Angeles region. And so the injunction continues to impose a burden on DHS officers who must operate under its terms when confronting those protests. Right. Thank you, counsel. Judge Bennett, did you have further questions? Thank you for asking, Judge Gould. Not at this time. Okay, I think the panel's concluded its question. I suppose we should turn to Ms. Wang's argument. Thank you, Your Honor, and may it please the court. This is Matt Borden. We intend to divide our and we did it topically. So Ms. Wang will be focusing on the jurisdictional elements and the justiciability parts of the argument, and I'll be focusing more on the merits. I'm having a little trouble. Oh, and I will be focusing more on the merits and workability if that's okay. Okay, thank you. Please try to speak as directly as you can into the mic. Sure, and thank you, Your Honors. Our nation was born from protests and the free press, which have continued to inform public debate throughout our history to this very moment. The district court properly protected these important rights while preserving any legitimate government interest in maintaining order. The district court supported its injunction with extensive findings that defendants were retaliating against journalists and protesters. It found that defendants were repeatedly assaulting people who were not threatening law enforcement, including several of the plaintiffs on multiple occasions at different events. It found that defendants were repeatedly misusing crowd control weapons on peaceful individuals. They were shooting people in the back, shooting people in the head over and over, shooting people who were running away from them. A highly trained marksman shot a reporter plaintiff in the face with a flaming hot tear gas canister. People have died that way, and you're never supposed to use these weapons like that. Counsel, am I correct that I think the question I asked your friend wasn't accurate, but am I correct that the two plaintiffs who could be characterized as protesters are Mr. Clymer and Ms. Almeida? That's correct, your honor. So why don't you explain to me how, in light of the Supreme Court's direction to us in CASA, it would be appropriate for us to affirm an injunction which appears to run in favor of every protester. I don't know that that's a defined term anywhere, but the district court is granting relief and constraining the actions of the government officials with regard to every protester. How does that, even if we were to agree with you that some injunctive relief were appropriate, how would that type of relief survive the Supreme Court statement in CASA? Two parts to the answer, your honor. First, in Easy Riders, the court, the Ninth Circuit, made this point, which is that, you know, you can't differentiate Ms. Almeida or Mr. Clymer from the other protesters. In order to grant them relief, you would have to give their pictures to law enforcement. It would have to be circulated among law enforcement. They would have to say, okay, well, we can't retaliate against these two individuals, but we can retaliate against everybody else. But counsel, the Supreme Court very recently said in granting the partial stay in CASA that the injunctive relief can't be broader than necessary to provide complete relief to each plaintiff withstanding to sue. Do you disagree with me that this injunction appears to grant relief to everyone who could be classified as a protester? It incidentally benefits other protesters, but it's the same example that Justice Barrett gave in her opinion with the nuisance in CASA. There can be loud noises and you can get an injunction against the noise or the nuisance, and it might benefit the neighbors or the other people in the vicinity. That doesn't make the injunction overbroad. The only way that you can get relief for Ms. Almeida, for example, is to have DHS stop using excessive force or retaliating against protesters. But this injunction covers any possible protest, right? It does cover, it covers protests. And it protects every possible protester. I think it would, otherwise it wouldn't benefit Ms. Almeida. It would not provide complete relief to her because she could show up to a protest. And if police were allowed to use excessive force against protesters, she could be among them and they wouldn't know. The only way that you're going to cure the chilling and the possibility of recurrent injury that this injunction is designed to address is if you prevent them from using force on everybody. So, Mr. Borden, under that argument, there's just no further narrowing that you think can be appropriate. So it applies to protests at which these two protesters don't even show up at? Well, they've expressed intent to show up at protests. And the actual evidence in the record is that these protesters, as long as the ICE raids continue, which Mr. Xi indicated was going to happen, as long as the federal officers were going to be policing them, they were going to come out and protest because they disagree with it. The reporters are going to come out and do their job because that's part of their job. And so, yes, she is going to be at other protests. She wants to be at other protests. She's put in evidence that she will be at other protests. That's the ongoing nature of the injury. And in terms of the idea of narrowing the injunction, I don't think it would be appropriate to narrow this injunction for the reasons that I just gave. But I would point out that in the colloquy you had with my friend on the other side, he was incapable of talking about any way that you could narrow this injunction while providing complete relief to people like Ms. Almeida or Mr. Clymer and the groups of reporters and legal observers that have also submitted, that are also plaintiffs in this case. I guess my view, Mr. Borton, perhaps I'm misinterpreting your friend's answer, but I think there's also a difference between if the injunction needs to be narrowed, whether the appropriate body to go into the details of narrowing it should be the Court of Appeals or the District Court. I believe my friend said to the panel that he understands that this court has the power to narrow the injunction if you felt, or to stay parts of the injunction if you could identify parts that were over broad. But this is an injunction that has been proven workable time and time again. Let me just push back on that on one of what I would describe as a fairly minor part of the injunction, but strikes me as entirely unworkable. In, for example, paragraph seven of the injunction, one of the indicia of being a journalist is the journalist carrying a professional press pass. How would a federal officer know who is or isn't carrying a press pass? It's not like displaying a press pass, it's carrying a press pass. A few responses to your Honor's question. First of all, it's just the way this definition of journalist works in this injunction is that it's just one indicia. So the fact that they're carrying a press pass does not render them a journalist per se. And there's also a savings clause in there that says they're not liable for violating the injunction. This is in paragraph seven. If you don't have the press pass out there where people can see it. Well, but where does it say that? I'm reading it says defendant shall not be liable for unintentional violations of this order in the case of an individual who does not carry or wear, not carry and wear. It is just one indicia, but to go back to index newspapers, this is the exact definition of journalist that was in index newspapers, which this court approved of, which not only did this court approve of it, but DHS followed this injunction for a period of several months in index newspapers. The city of Portland followed this injunction for three years and successfully worked it. It was so successful that the city of Portland embedded it into their police directives. Many other courts, including the Goyette court in Minnesota, adopted similar terms for journalists. And even California has a law that says that you can't disperse journalists and journalists are in fact allowed to go past police lines under this California statute. This injunction has been stress tested many times and law enforcement is capable of following it. To go back to your point, Judge Nguyen, following their own policies is something that DHS is trained to do. They're trained up on that. In index newspapers, when we brought this new provision into being about reporters and legal observers, this was the way that our expert in that case, Gil Perlikowski, who's the same expert in this case, he is the former commissioner of Customs and Border Protection. He was also the police chief in Seattle where they had protests of over 50,000 people that were way more chaotic and violent than anything that we've seen. Some of these events in Los Angeles are 30 to 60 people. He never dispersed journalists or legal observers. It was all very workable. So the idea that they can't tell who's a journalist proved wrong. They were able to, not only are they trained on their own policies, they're trained on the force amendment, they're trained not to use excessive force, they're trained not to shoot people that are peacefully protesting, but they learned how to follow the injunction in index newspapers when it issued in the district court very quickly. Because that's part of what police officers are trained to do. How would a police officer, for example, be able to tell in a potentially violent situation whether somebody wearing a green hat were a legal observer or somebody who's about to engage in violent activity? The NLG legal observer hats are very distinctive, but in the three years that this injunction was effected in Portland, the police had no problem as a factual matter making that distinction at all. And neither did DHS when they were under the same injunction in index newspapers. So this is what police officers do is they make a lot of, they're trained to make fast decisions, they're trained to assess risk, they're trained to assess threats, and they successfully followed this same injunction in index newspaper. And literally, it's become the law in multiple jurisdictions. Other police follow it as well. They can make these differentiations and they do it safely. I will tell you that to go back to a question, I forget who asked it, but what evidence of irreparable injury is there in this record between the time the court issued the injunction and now? The answer is none. There is no incident of any officer, any federal agent, anybody suffering any harm as a result of this injunction in the last three months that it's been in effect. There's no evidence of any harm to anybody, to any federal officer or state officer or city officer, municipal officer, any type of law enforcement officer ever from this type of injunction from the injunction in index newspapers. What we've seen is a long track record of this injunction being stress tested and being totally safe and followable for law enforcement. If I could just jump in with a couple of other factors responsive to, I think it was Judge Bennett's question about who the protester plaintiffs are in the case. So Ms. Almeida and Mr. Clymer are our protester plaintiffs at the time the court issued its preliminary injunction order. We have since amended the complaint. There's an additional protester plaintiff, Ms. Poss, and we have also made class action claims. That complaint was not in effect at the time the court issued the PI, right? That's correct, but given that the government is asking this court to vacate the injunction, which I'm not sure is appropriate for a motion to stay, I understand we have an appeal coming up in a few weeks, but given that the government is asking for this court to vacate it, ask the district court to essentially fashion a new injunction, those plaintiffs will be before the court when that happens. And so there's, I guess, a question also of judicial economy here to consider. Certainly the class action claims affect the CASA analysis as the Supreme Court sort of stated in its recent decision in the AARP case, the court's authority to protect its jurisdiction over classes. I'd also want to add an additional issue about standing that also goes to the scope of the injunction. So the provisions on restricting use of force by DHS at protests protect our journalist plaintiffs as well as the protester plaintiffs. They protect the members of the organizational plaintiffs. The injunction is specifically tailored geographically to those organizational plaintiffs. The use of force that is being enjoined and that the district court found DHS is systematically engaged in, it does not discriminate between press, legal observers, and protesters at these events. They are so massive and sweeping and discriminant that everyone is getting caught up in them. And so under this court's reasoning and easy riders, in order to afford complete relief to all of our plaintiffs, including the journalist plaintiffs, it really does have to cover everyone who is present at these events which are blanketed with the conduct at issue. So any, in your view, any protest in the counties of Los Angeles, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, and Ventura, every protest where there could be federal officers there for everybody who could attend those protests is covered? Well, plaintiffs would be the only people who would be able to, I guess, invoke the protections of the injunction. But in order for the injunction to afford them that protection, it does have to provide that scope of coverage, given what we have put into the record, given what the district court found about the press coverage area and the membership. So I'm not sure I understand your last statement. So are you saying that in plaintiff's view, if there were a violation of the injunction, but not with regard to a named plaintiff, that there could be no relief for that violation granted by the district court? Well, first, I'll clarify that. I do think that if a member of one of the organizational plaintiffs was injured, that the organizational plaintiffs would have standing and would be protected by the preliminary injunction, could enforce the preliminary injunction. But if it were some third party, not a member of one of the organizations, then I think that in the normal course of things, we would expect someone like that to try and intervene in the case to enforce that on their own behalf. But to go back to my question, notwithstanding the language of this injunction, the plaintiff's position is that if John or Jane Doe, who is not a named plaintiff in this case, that if they were a protester and this injunction were violated with regard to them, but not with regard to a named plaintiff, that nobody could be held in contempt? That would be my answer from the position of standing. I don't know if Mr. Borton has anything to add from his analysis of CASA. I think that's correct as a matter of, I think the point is somebody could try to intervene. And I think we have class allegations now. So I think putative class members would have standing to enforce this. If I may turn to the retaliation point that my friend made, I would just go back to what I was saying about the record in this case, which is that there are over 40 declarations that we submitted by people who were present. There was extensive video evidence, there were photographs, there were maps. All of this was carefully analyzed by the district court. The government in response did not refute a single one of those declarations. Our expert put in a declaration stating that all of the uses of force that he saw in literally what were hundreds of incidents described in the declarations were excessive and unnecessary. That declaration was also not refuted. The government has video from their cameras on the buildings of these events. They have people taking video and posting things on media. There is zero videos that the government submitted in response to all of these declarations in response to the videos, which show that federal officers are opening fire on crowds and discharging volleys of pepper balls and shooting tear gas indiscriminately at people who are not posing any threat to them. And I would just give you one example if you want to go back and look at the record carefully. Mr. Sharman, who's the government's witness in paragraph 15 of his declaration, talks about an event on June 7th where the government comes out of the building and the crowd is supposedly throwing Molotov cocktails at them and chunks of concrete and rocks and fireworks. But we actually have a video of that very moment in time in the declaration of Alexis Olivier Ray, who's one of our plaintiffs. This is at paragraph 19 of his declaration and you can see them exiting the building and nobody is throwing anything at them. And in fact, you can just see that they're standing about 50 feet away from the federal agents so that it wouldn't even be a threat of throwing anything. And then at that point you see a massive discharge of firepower at this crowd and there's tear gas being shot in the air. You can hear the rat-a-tat of the pepper balls. And then going on to that declaration in the incident report that the government submitted as exhibit two to Mr. Sharman's declaration, they say that they chased violent rioters up the street. But what you can see in the video in paragraph 27 of Mr. Ray's declaration is that the government is shooting at him and he's yelling out, un-press, un-press. And there's a line, there's a skirmish line of about 30 officers proceeding forward and you don't really see this whole violent crowd of protesters. And in fact, if you look at the next video that he includes at paragraph 31 of his declaration, you can see reporters with big tripods and clunky cameras trying to run from being shot at by federal officers who are just shooting at them. There's not a protester in the video and you can't even see a piece of federal property. So the district court carefully went through this evidence. There's not a single video from the government that would contradict any of this. And he found that their explanations for why they were attacking people were not credible. This is a situation where these findings are absolutely correct. They don't come to the level of clear error, which is what they would have to show to set them aside. And so you have a situation that is literally identical to index newspapers where this court found exceptionally strong evidence. It was exceptionally strong evidence of retaliation where you had this kind of mountain of evidence that they called it in index newspapers, avalanche of evidence, which Judge Vera called it below. It is, you know, in a case where you have to prove intent circumstantially, this is the strongest evidence that there is. I would note that this court in Sanderlin, where it was just a one-off shooting at a protest, said that if the government can't explain why they shot this person, that is strong evidence of intent. And in fact, we don't see any explanations. We don't see any investigations. We don't see any discipline. What you have is an agency that is adopting these policies and is basically owning the conduct of all of these agents at the forum and what is an incredible pattern of violence over a period of 12 different protests, where the one through line where you have rural areas, you have urban areas, you have big protests, you have small protests, the through line is that they're shooting people and tear gassing people who are peaceful, who are not posing an imminent threat of harm to law enforcement. And that's what this injunction does, is it says if there's an imminent threat to law enforcement, you're allowed to use force, you're allowed to use less lethals, you're allowed to use the tools in your toolkit, but what you can't do is attack people who are peacefully there at the forum. Thank you, Mr. Borden. By the way, the time currently shown on the clock appears to be complete. Thank you, your honors. Mr. Shee, does the government have rebuttal? I would like five minutes of rebuttal, your honor, if that's permissible. Yeah, how much time did you say? Five minutes, your honor. Yeah, I think if the other judges vote agreeable, I'd like to hear the rebuttal. Yes, absolutely, Judge Gould, Judge Nguyen. Okay, please proceed. Thank you very much, your honor. I would like to make three points on rebuttal. The first two about the nature of equitable relief, and the third about the factual is that the other side's presentation has made clear the extent to which their understanding of the court's equitable power diverges from the Supreme Court's description of that power most recently in the Trump against Casa case. Over and over again, the other side began from the premise that plaintiffs are entitled to complete relief as long as they can show standing. And as the Supreme Court made clear in Casa, that's just not how equity works. The way injunctions work is that the complete relief principle operates as a ceiling, but other equitable factors need to play into the balance. And yet the other side's approach to equity takes that inquiry and turns it on its head, where they proceed from the premise that they're entitled to complete relief, and then assume that the provisions of the injunction must then be tailored in order to maximize their relief. And that's the reason why at the highest level of generality, the district court's injunction, which adopted their proposed approach, can't be reconciled with Casa and ordinary principles of equity and restrictions on Article III authority. The second point I'd like to make, Your Honor, is even if one thinks that some injunctive relief is appropriate, that relief, as Judge Bennett has repeatedly pointed out, needs to be tied to the particular harm for which plaintiffs have asserted standing and been able to demonstrate standing. The district court's standing analysis turned on its belief that the individual plaintiffs, and then by extension the organizational plaintiffs, had standing because of retaliatory uses of force against them. So one might expect an injunction to focus on that, but this injunction goes far beyond that standing finding by the district court. For example, the provision respecting warnings doesn't appear to have any relation to the use of retaliatory force. And indeed, in the Puente v. City of Phoenix case, which I urge this court to consult, the court actually held that the First Amendment doesn't require the issuance of verbal warnings at all in the context of a violent or disruptive protest. And so the highly reticulated terms of this injunction, which read very much like a law enforcement manual, just go far beyond what is to remedy even what plaintiffs have asserted standing over and what the district court found, which all turns on not merely the use of crowd control devices, but the use of crowd control devices in a retaliatory manner. And that leads to my third and final point, which I want to leave the court with. The other side has made many representations about the facts in this case, and I would urge the court to look closely at the district court's findings. One example that the other side relied upon, for example, is the allegation that Mr. Beckner Carmichael at the Paramount protest was struck in the face by a tear gas canister, and that had to be retaliatory in nature. But as the government explained to the district court, and as the plausible alternative explanations that are not retaliatory in nature. For example, at the time, Mr. Beckner Carmichael was standing just 20 feet away from protesters, and the government officers there may have been attempting to fire up and over the crowd to avoid hitting Mr. Beckner Carmichael. And similarly, it could have been the case that that tear gas canister may have been picked up by a protester and flung backwards to strike him. Now, I'm not saying that the court needs to hold right now that it agrees or disagrees with those alternative explanations, but the point is that the district court at a minimum was required to consider them before finding that that particular use of force had subjective retaliatory intent. And if you look at what the district court said on page 1 of SCR 14, the court acknowledged the alternative explanations and then just moved on without providing any further analysis as to why it thought the government's alternative explanations were not plausible in the context of the record. And so the broad-brush statements about retaliatory intent on which the district court relied are based on highly generic understandings of these incidents when what the district court needed to do in order to demonstrate retaliatory intent was look at the specifics of each of them, and that is why those findings were clearly erroneous. And so for these reasons, we urge the court to stay the injunction pending appeal. Thank you, Mr. Sheehy. Now, because we've divided up the issues a bit, I think we've covered all the points to be argued. But if panel judges think there's someone else that we need to hear from, briefly, they can let me know now. I don't have any further questions. Thank you, Judge Gould. Thank you for asking, Judge Gould. I also do not have any further questions. And nor do I. So we will now submit this case. And it's a very challenging case, posing a lot of difficult issues. So we'll try to get a decision out at the earliest possible time, keeping in mind that I think probably everyone would like to hear from us as soon as possible. So thank you all. And the clerk can show this case. Now I submit it. And I want to thank again all the advocates for their excellent arguments. And thank the panel judges for their clerks staff, clerk's office staff for all their efforts to put this hearing together in a timely way. With all those things, thank you. I think we are now adjourned. Thank you, Judge Gould. Thank you, Your Honors. Thank you, Your Honors. This court for this session stands adjourned.
judges: GOULD, NGUYEN, BENNETT